UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FRED HENRY PERDUE, III,

     Plaintiff,

v.                                                                    Case No. 4:20cv103-WS-HTC

W. OBERSCHLAKE, et al.,

     Defendants.

_____/

<u>REPORT AND RECOMMENDATION</u>

This matter is before the Court on Defendants' motion for summary judgment (ECF Doc. 42). The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). Upon consideration of the motion, evidence, Plaintiff's response in opposition (ECF Doc. 51), and Defendants' Reply (ECF Doc. 52), the undersigned recommends the motion be GRANTED.

## I.    BACKGROUND

Plaintiff Fred Henry Perdue, III, is an inmate of the Florida Department of Corrections ("FDOC"), currently incarcerated at Hamilton Correctional Institution.

Plaintiff sues five (5) employees[1] of Madison Correctional Institution ("Madison C.I.") in the following capacities:  Sergeant W. Oberschlake (individual capacity), Sergeant R. Oliver (individual capacity), Captain T. Terry (individual and official capacities),[2] Colonel E. Pride (official capacity), and Assistant Warden S. Bearden (official capacity).  ECF Doc. 7.

Plaintiff sues Oberschlake and Oliver for excessive force, arising out of a cell extraction occurring on February 22, 2018, which Plaintiff alleges was in retaliation for the filing of grievances.  *Id.* at 7.  Plaintiff sues Terry for failure to intervene to stop the excessive force and for making threats in retaliation to Plaintiff's filing of grievances.  Plaintiff sues Pride and Bearden for failing to immediately place him in protective management after he complained of threats by inmates and officers.

As discussed below, the Court finds that Plaintiff's claims for excessive force, retaliation and failure to intervene against the Defendants are blatantly contradicted by the video evidence, which shows that the force used by Oberschlake and Oliver was not more than necessary to maintain order and to obtain compliance.  The Court also finds that Plaintiffs' failure to protect claims fail because Pride and Bearden

---

[1] Plaintiff also included FDOC Secretary Mark Inch as a sixth defendant; however, the Court declined to serve Inch and terminated him as a defendant in this action because Plaintiff failed to state a claim against him.  *See* ECF Docs. 8, 10.

[2] In the amended complaint, Plaintiff appears to have scratched through the "individual capacity" box for Terry, leaving only the "official capacity" box checked (ECF Doc. 7 at 4).  However, the Court will liberally construe Plaintiff's claims against Terry as being in both his individual and official capacities.

responded reasonably.   Accordingly, the undersigned recommends Defendants'

motion for summary judgment be GRANTED.[3]

## II.    SUMMARY JUDGMENT STANDARD

To prevail on a motion for summary judgment, a defendant must show that

the plaintiff has no evidence to support his case or present affirmative evidence that

plaintiff will be unable to prove his case at trial.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23 (1986).  If a defendant successfully negates an essential element of

plaintiff's case, the burden shifts to plaintiff to come forward with evidentiary

material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of

some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986).

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  Summary judgment is not appropriate if a reasonable jury could return a

---

[3] Plaintiff also sues Defendants for violating FDOC policies.  However, a violation of departmental rules or policies, standing alone, does not infringe upon an inmate's constitutional rights.  *Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (holding that prison regulations are not intended to confer rights or benefits on inmates but are merely designed to guide correctional officials in the administration of prisons); *Fischer v. Ellegood*, 238 F. App'x 428, 431 (11th Cir. 2007) (finding plaintiff's claim alleging defendants violated an internal jail policy insufficient to survive summary judgment).

verdict in favor of the non-moving party. *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). The courts liberally construe the filings of *pro se* litigants. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). However, "a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

## III.   DISCUSSION

In support of Defendants' motion, they rely on video and audio footage, incident and disciplinary reports, medical reports, inspector general reports, and Plaintiff's deposition. ECF Docs. 42-1 through 42-13. In his response, Plaintiff reiterates the allegations from the amended complaint and argues Defendants failed to preserve "some vital evidence in the form of audio and video footage." ECF Doc. 51 at 3.

The Court puts little credence in Plaintiff's purported spoliation argument. First, the issue was not raised during the discovery period. Second, in Defendants' reply they confirm they "obtained and provided Plaintiff and the Court with every known surveillance recording in existence that Defendants were able to obtain from the FDOC." ECF Doc. 52 at 3. Third, the video evidence relied upon by the Defendants depict the entire use of force incident; thus, Plaintiff has failed to identify

what other evidence was available or necessary.  Instead, his allegations regarding the existence of some other evidence are purely conclusory.

When considering the evidence presented by the parties as well as the allegations in the amended complaint, the Court finds that no reasonable jury could find in favor of Plaintiff on any of his claims.

### A.    Excessive Force

Plaintiff alleges he filed a grievance on February 1, 2018, regarding alleged "illegal acts by officers and inmates."  ECF Doc. 7 at 8.  Plaintiff was interviewed with or spoke with Defendants Pride and Bearden, who despite a promise to do so, did not take any action to place him in protective custody.  *Id.*  As a result, Plaintiff was subsequently "subjected to acts of revenge/retaliation", which caused him to "snap" and try to commit suicide.  *Id.* at 8-9.

On February 22, 2018, after Plaintiff's suicide attempt, he was taken to an outside hospital.[4]  ECF Doc. 51 at 10.  Upon his return to Madison C.I., the mental health unit ordered Plaintiff to be placed on suicide watch.  ECF Doc. 7 at 9.  Because Plaintiff was "unresponsive to anyone or orders to submit to hand restraints," a cell extraction was subsequently ordered.  *Id.*  Defendants Oliver, Oberschlake, and three (3) other officers (who are not defendants in this action) were part of the cell

---

[4] Plaintiff initially attempted to flood his cell by continually flushing the toilet after stuffing the toilet with bedsheets and then swallowed a battery.  ECF Doc. 42 at 9.

extraction team.  *Id.*  "Plaintiff was sitting on his bunk in a non-threatening or provocative manner" when the officers entered Plaintiff's cell.  *Id.*  Plaintiff alleges that Oliver and Oberschlake assaulted Plaintiff by punching him multiple times in the head, feet, and upper torso, causing Plaintiff to suffer multiple injuries, including contusions, bruises in the head and upper torso, and a swollen eye.  *Id.*  Plaintiff also alleges Defendant Terry failed to intervene in the alleged excessive use of force.  *Id.*

After the cell extraction, Plaintiff was placed on suicide watch, at which time Pride came by Plaintiff's cell to see why Plaintiff was screaming and crying.  *Id.* at 10.  Pride noticed Plaintiff's injuries to his head, torso, and eye and ordered that pictures be taken of the injuries.  *Id.* at 10.  Plaintiff informed Pride that he believed the injuries were intentionally inflicted during the cell extraction in retaliation for Plaintiff's filing of grievances, and Pride assured Plaintiff that he "would be protected from further misconduct/assaults."  *Id.*  Subsequently, on the same day, Terry came by Plaintiff's cell and allegedly threatened that Plaintiff would endure more acts of retaliation if he did not remain quiet about the assault during the cell extraction.  *Id.*

Those are the allegations in the amended complaint.  The handheld video footage (ECF Doc. 42, Exhibit 14, "Handheld Video for Use of Force Case No. 18-03810"), however, paints a very different picture.  The video begins by showing Terry explaining that a cell extraction team was formed at 8:55 a.m. because Plaintiff

refused to submit to restraints and come out of his cell, and that an institutional psychologist, Doctor Meeks, ordered Plaintiff be removed from his cell and placed in a special housing operation cell ("SHOS status").  (00:08–00:43).[5]  Terry also states that the Warden has been contacted and approved the use of force for purposes of the extraction.  Terry also instructs the officer holding the camera to advise him if the camera malfunctions at any point during the extraction so that a backup camera can be initiated.  Terry then instructs the extraction team that, upon arrival at Plaintiff's cell, they will give Plaintiff one more opportunity to submit to restraints, and if Plaintiff refuses, the officers should enter the cell and use the minimal amount of force necessary to restrain Plaintiff and remove him from the cell.  (01:27–01:53).

After Terry's instruction, the cell extraction team, consisting of five (5) officers (Oberschlake, Oliver, and three (3) officers who are not defendants in this action), summarize their extraction team roles for the camera.  (02:02–02:21).  Oberschlake identifies himself as the number one team member who is to enter the cell and use the plexiglass shield to immobilize Plaintiff.  *Id.*  Oliver then identifies himself as the number two team member who is in charge of controlling the inmate's upper extremities and assisting the number three team member with placing restraints on Plaintiff.  *Id.*  Both Oberschlake and Oliver note that they are trained in

---

[5] The parentheticals note the time elapsed on the video and not the time of day of the events.

forced cell extraction.  *Id.*  The remaining three officers then identify themselves and summarize their roles.  (02:23–03:08).

Terry and the extraction team approach Plaintiff's cell, and Terry verbally instructs Plaintiff to submit to restraints.  (04:00–04:32).  Plaintiff stands at the cell door and is visible through the cell door window, where he looks at both the camera and Terry.  *Id.*  Terry advises Plaintiff that if he refuses the order to submit to restraints, a cell extraction will occur.  *Id.*  Terry waits twenty-three (23) seconds for Plaintiff to comply, then Terry asks, "you going to comply?"  (04:26–04:49).  Terry waits an additional thirty-four (34) seconds, while noting that Plaintiff is refusing to submit to restraints and advising the extraction team to use the least amount of force necessary.  (04:49–05:23).  Terry's description of Plaintiff's conduct is consistent with Plaintiff's own admission that he was "unresponsive to anyone or orders to submit to hand restraints."  *See* ECF Doc. 7 at 9.

After Plaintiff's refusal to follow Terry's order, the cell door is opened, and the cell extraction team enters the cell.  ECF Doc. 42, Exhibit 14, at (05:23–05:27).  When they enter, Plaintiff is sitting on his bed.  *Id.*; ECF Doc. 51 at 11.  The extraction team immediately pins Plaintiff against the bed with the plexiglass shield.  ECF Doc. 42, Exhibit 14, at (05:23–05:27); ECF Doc. 42-9 at 1.  Plaintiff and the officers are seen in the space between the lower and top bunk, and immediately

Plaintiff yells "He just punched me. He just punched me." ECF Doc. 42, Exhibit 14, at (05:27–06:41).

Throughout the extraction, which takes roughly ninety (90) seconds, Plaintiff is ordered to stop resisting several times and officers yell at Plaintiff to show his hands. *Id.* In a subsequent disciplinary report, Plaintiff pleads guilty to committing battery during the cell extraction—namely, to grabbing Oberschlake's right index finger and bending it backwards in an attempt to cause bodily harm. ECF Doc. 42-4 at 1. Plaintiff is eventually restrained and placed in leg shackles, and the officers assist Plaintiff to his feet. ECF Doc. 42, Exhibit 14, at (05:27–06:41).

Terry then directs the officers to escort Plaintiff to medical. (06:56). During the escort, Plaintiff spits on Oliver, (07:17–07:20), who is then relieved of his duties as an escort. Undeterred, Plaintiff subsequently spits on Officer Gianino (who is not a defendant in this action), (08:44–08:46), at which point Plaintiff is placed down in a prone position, and a spit shield is put on Plaintiff's head. (08:44–11:26). While waiting for staff to bring the officers a spit shield, Plaintiff is heard stating that officers are trying to break his hands. This comment is acknowledged by Terry, who notes that neither officers are touching Plaintiff's wrists. Later, Plaintiff tells the

camera he spit on the two (2) officers because they put their hands on him during the cell extraction.[6]  (12:49–13:01).

Plaintiff also taunts the officers by saying, "I got something for you." (13:29–13:38).  Additionally, Plaintiff tells one of the officers that he is "going to pay" for the cell extraction, stating, "I swear on my momma he gonna pay for that. I swear on my momma that you gonna die. . . . Give me two weeks. I swear on my momma you gonna die." (14:30–15:25).  None of the officers provoke Plaintiff, but he continues: "I know that's right.  You think I'm playing?  Watch. . . . I swear on my momma's grave, in two weeks, homeboy, they coming to see you.  Watch.  Watch. . . . I hope you got a good taste of my spit in your face, too, you d***-sucking ass n*****." *Id.*  He also tells the officer holding the camera that he will spit on him too if he puts his hands on him.

The nurse eventually arrives, and Plaintiff repeatedly tells her "don't touch me, don't touch me … do not put your hands on me, woman." (16:00–16:40).  After Plaintiff refuses a medical examination, he is placed into the cell, and his clothing is removed and replaced with a protective vest, over his statements that he can remove his own clothes because "he is not in daycare". (16:42–18:35).  Plaintiff is then

---

[6] Plaintiff received a disciplinary report for this assault as well as for bending Oberschlake's fingers during the extraction and after an investigation by the Inspector General's Office was referred to the State Attorneys' Office for felony criminal prosecution.  ECF Doc. 42 at 14.

ordered to pick up his right foot while his booties are being removed, but Plaintiff refuses to comply with that order and states, "I ain't picking up shit." (20:53–20:54).

Plaintiff later looks at the camera and tells Oliver to "come on in" because he's going to pay for that. He tells Oliver he's got a .357 with his "name on it" and that he's going to kill Oliver's kids too. When Terry comments that Plaintiff is making threats towards Oliver, Plaintiff states it is "not a threat, it is a "promise," not a threat, and "you better check my resume." (22:54–24:00). After Plaintiff's leg shackles and spit shield are removed, Plaintiff repeatedly taunts the officers with profanities and refuses to come to the door flap to have his handcuffs removed, telling the officers to "come get me" and threatening violence if the officers attempt to get the cuffs off of him. (25:40–31:05).

The Eighth Amendment to the U.S. Constitution prohibits the infliction of cruel and unusual punishment. See U.S. Const. amend. VIII. The "core judicial inquiry" in considering an Eighth Amendment excessive force claim, therefore, is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see Wilkins v. Gaddy*, 559 U.S. 34, 38–39 (2010). To determine whether an officer applied the force maliciously and sadistically, courts consider the following factors: "(1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat 'reasonably perceived by the responsible

officials,' . . . (4) 'any efforts made to temper the severity of a forceful response,'"

and "(5) [t]he absence of serious injury." *Hudson,* 503 U.S. at 1, 7 (*citing Whitley*

*v. Alber*s, 475 U.S. 312, 312, (1986)).

Despite Plaintiff's assertions to the contrary, the handheld video evidence

"blatantly contradict[s]" Plaintiff's version of the use-of-force incident. *See Jones*

*v. City of Cincinnati*, 736 F.3d 688, 692 (6th Cir. 2012) (quoting *Scott v. Harris*, 550

U.S. 372, 380–82 (2007)).  Namely, contrary to Plaintiff's allegation that "Oliver

and Oberschlake proceeded to assault plaintiff by hitting him with closed fist

repeatedly," ECF Doc. 51 at 11, which Plaintiff suggests is supported by the

handheld video footage, *id.*, the video evidence shows no such act by either

Oberschlake or Oliver.

Moreover, although Plaintiff implies he was not resisting during the cell

extraction, *id.* at 11–12 & 16, the video shows the officers struggling to restrain

Plaintiff, and Plaintiff subsequently pleaded guilty to committing battery on

Oberschlake during the extraction, ECF Doc. 42-4 at 1.  Thus, the Court must

"view[] the facts in the light depicted by the videotape" and cannot adopt the version

of the facts offered by Plaintiff. *See Jones*, 736 F.3d at 692; *Scott*, 550 U.S. at 380

("When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Considering the video evidence and application of the *Hudson* factors, Plaintiff cannot establish that the force used against him was either excessive or applied maliciously or sadistically, as necessary to establish an Eighth Amendment claim. First, the undersigned finds there was a need for the officers to use force, as Plaintiff was not complying with a lawful command to submit to hand restraints. *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) ("The need for the use of force [was] established by the undisputed evidence that [the prisoner] created a disturbance."). As discussed above, the extraction team was initially formed because Plaintiff refused to submit to hand restraints, and when the extraction team arrived at Plaintiff's cell, Terry gave Plaintiff an additional opportunity to comply, yet Plaintiff again refused.

Second, the need was proportional to the force used. As depicted in the video, the only "force" the officers exerted on Plaintiff was to use their bodyweight and the plexiglass shield to restrain Plaintiff by pinning him against the wall and bed, as Plaintiff continued to struggle, resist, and commit battery on Oberschlake. *See Smith v. Wester*, No. 5:18-CV-192-TKW-HTC, 2020 WL 1678960, at *8 (N.D. Fla. Mar. 12, 2020), *report and recommendation adopted*, No. 5:18CV192-TKW-HTC, 2020 WL 1678078 (N.D. Fla. Apr. 6, 2020) ("[R]estraining [an inmate] with body weight

. . . [is] 'not of a sort repugnant to the conscience of mankind.'"); *Palmer v. Johnson*, 2012 WL 380112, at *10 (M.D. Fla. Feb. 6, 2012) (finding that Defendant's application of pressure to Plaintiff's leg, where Defendant was assisting another officer in restraining Plaintiff on the ground, did not amount to excessive force).

Moreover, although Plaintiff alleges Oliver and Oberschlake assaulted him by punching him multiple times in the head, feet, and upper torso, no such conduct can be seen on the video.[7]  And, even if such conduct did occur, it is not the type of force that is "repugnant to the conscience of mankind," *Johnson v. Moody*, 206 F. App'x 880, 884–85 (11th Cir. 2006) (quoting *Hudson*, 503 U.S. at 9–10), especially considering how much Plaintiff was resisting Defendants' attempts to subdue him. *See Black v. Butler*, 2013 WL 6085980, at *9 (N.D. Ala. Nov. 19, 2013) ("The slap by one officer and the thump in the eye by another are *de minimus* intrusions that do not violate the Eighth Amendment."); *Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1318 (S.D. Fla. 2012) (holding defendant officer's punches to the plaintiff's ribs were not excessive where the plaintiff was resisting arrest and a reasonable officer could believe the punches were necessary to coax a suspect into surrender).

Third, the officers reasonably perceived Plaintiff's refusal to comply with a lawful order and subsequent physical resistance to their custodial holds as a threat.

---

[7] Plaintiff was interviewed by the Inspector General regarding his allegations of misconduct by officers and was unable to produce any evidence or witnesses.  Thus, the investigation was closed for lack of credible evidence.  ECF Doc. 42 at 15.

As mentioned above, during the extraction, Plaintiff continued to resist and attempted to cause bodily harm on Oberschlake.  *See Miles*, 757 F. App'x at 829 (internal quotations omitted) ("[The Eleventh Circuit] give[s] a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.").  Moreover, Plaintiff's hostile conduct *following* the cell extraction supports the Court's finding that the officers reasonably perceived Plaintiff's behavior prior to and during the cell extraction as a threat.  Indeed, as noted above, Plaintiff spit on two officers, threatened the life of an officer and the officer's children, continued to disobey lawful orders, and refused to allow medical treatment.

Fourth, the officers made several attempts to temper the severity of a forceful response.  When the extraction team arrived at Plaintiff's cell, Terry waited nearly an entire minute for Plaintiff to comply, but Plaintiff refused to do so.  After the cell extraction began, the officers used the minimal amount of force necessary to obtain the compliance of Plaintiff.  Once Plaintiff ceased his insubordinate conduct and the officers were able to restrain him, the officers immediately transported Plaintiff to the medical department for a post use-of-force evaluation.

Finally, the extent of Plaintiff's alleged injuries, which includes contusions, bruises in the head and upper torso, and a swollen eye, ECF Doc. 7 at 9, does not

support a finding of excessive force.[8]  *See Tate v. Rockford*, 497 F. App'x 921, 925 (11th Cir. 2012) (noting that laceration on forehead, several small abrasions and cuts, and a swollen right eye—but no broken bones or additional injuries or permanent injury or debilitating pain—suggest *de minimis* injury); *Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (noting that bruises received during an arrest were non-actionable, *de minimis* injury).

Thus, the Court finds that no reasonable jury could conclude, based on the video evidence, that Defendants Oberschlake and Oliver (or any of the officers) acted maliciously or sadistically or used excessive force such as would be necessary for Plaintiff to be entitled to relief under the Eighth Amendment.[9]  *See Scott*, 550 U.S. at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Coulston v. Glunt*, 665 F. App'x 128, 132 (3d Cir. 2016) (affirming grant of judgment in favor of defendant on excessive force claim

---

[8] Additionally, in light of the *de minimis* nature of Plaintiff's alleged injuries, Plaintiff's request for punitive damages lacks merit.  However, to the extent Defendants argue Plaintiff may not receive punitive damages because he has failed to show a sufficient physical injury, ECF Doc. 42 at 48, the Court notes that Defendants are incorrect, as they are relying on old law.  *See Hoever v. Marks*, 993 F.3d 1353, 1364 (11th Cir. 2021) ("[W]e now hold that § 1997e(e) permits claims for punitive damages without a physical injury requirement.").

[9] Because the Court finds that Defendants Terry, Oberschlake and Oliver are entitled to judgment on the Plaintiff's claims against their individual capacities for lack of excessive force or retaliation, the Court need not address the Defendants' qualified immunity argument.

where, "despite [plaintiff]'s assertions to the contrary, the video showed that [defendant] acted in an effort to maintain discipline").

### B.    Failure to Protect and Failure to Intervene

As stated above, Plaintiff sues Terry for failure to intervene.  However, that claim necessarily fails because Oberschlake and Oliver did not use excessive force. Thus, there was no reason for Terry to intervene.  *See Brown v. Mastro*, No. 3:17CV691-TKW-HTC, 2020 WL 1917661, at *10 (N.D. Fla. Mar. 27, 2020), *report and recommendation adopted*, No. 3:17CV691-TKW-HTC, 2020 WL 1916688 (N.D. Fla. Apr. 20, 2020), *appeal dismissed sub nom. Brown v. Bay Cty. Commissioners*, No. 20-11950-D, 2020 WL 5049033 (11th Cir. July 2, 2020) ("[B]ecause . . . no excessive force was used, Defendants had no constitutional obligation to intervene.").

Plaintiff also seeks to recover against Pride and Bearden for failing to place him in protective management after he alerted them to threats that were being made against him.  As an initial matter, Plaintiffs' claims against Pride and Bearden (as well as Terry, in his official capacity) are subject to dismissal because Defendants are immune from liability for claims alleged against them solely in their official capacity and seeking monetary damages.  *See Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016) ("A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the

state's immunity."); *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994) ("Under the Eleventh Amendment, state officials sued for damages in their official capacity are immune from suit in federal court.").  Thus, because Plaintiff is the master of his complaint, the analysis should end here.  However, recognizing Plaintiff is proceeding *pro se*, the Court also considered whether Plaintiff has presented evidence to show Pride and Bearden are liable in their individual capacities and finds he has not.

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates."  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)) (alterations and internal quotation marks omitted).  "A prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk."  *Caldwell*, 748 F.3d at 1099 (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)) (internal quotation marks omitted).

Thus, "[t]o prevail on such a claim brought under § 1983, the plaintiff must show: (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the Eighth Amendment violation."  *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).  "There must be a 'strong likelihood' of injury, 'rather than a

mere possibility,' before an official's failure to act can constitute deliberate indifference." *Id.* (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

Plaintiff has not established those elements as to Defendants Pride and Bearden. First, Plaintiff has not established Bearden and Pride were aware of a substantial risk of serious harm. "When examining the first element—a substantial risk of serious harm—the court uses an objective standard." *Caldwell*, 748 F.3d at 1099 (citation omitted). The alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Also, the official must actually know of the substantial risk of serious harm; mere negligence is insufficient. *Hughes*, 894 F.2d at 1537 ("Merely negligent failure to protect an inmate from attack does not justify liability under section 1983.").

Plaintiff's allegation, at best, is that Bearden and Pride should have known of the risk of injury to him based on Plaintiff's conclusory allegation that an officer told Plaintiff he was going to "get it." ECF Doc. 7 at 8. This allegation, however, even if true, is the type of "generalized awareness of risk" that the Eleventh Circuit has found as insufficient to satisfy the subjective awareness requirement. *See Carter*, 352 F.3d at 1350; *see also Reid v. Polk*, 2018 WL 1426428, at *9 (M.D. Fla. Mar. 22, 2018), *appeal dismissed*, No. 18-12168-D, 2019 WL 2261242 (11th Cir. Feb. 27, 2019) ("[S]tatements of generalized fear of the 'more than 140' convicted

murderers and gang members housed in B dormitory who could potentially harm him because they knew about his child sexual battery conviction and had referred to him as a homo and baby raper (sic) . . . suggest no more than the type of generalized risk found insufficient in *Carter*.").

Second, Bearden and Pride responded reasonably to Plaintiff's concerns. A prison official may avoid Eighth Amendment liability for failure to protect an inmate by showing he "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844)) (internal quotations omitted). Plaintiff admits in his allegations that both Bearden and Pride investigated Plaintiff's concerns regarding his safety—namely, Plaintiff acknowledges that he met with both Defendants, and after meeting with Pride, Pride approved Plaintiff's grievance and informed Plaintiff that he would be placed on protective management status. ECF Doc. 7 at 8. Plaintiff also admits he was subsequently informed by Bearden that he had been approved for a protection transfer, and that Plaintiff was, in fact, eventually transferred. ECF Doc. 7 at 12.

Moreover, Plaintiff admitted his deposition that Pride and Bearden could only make a recommendation regarding protective management as the final decision had to be made by the state classification officer at the central office. EF Doc. 42-13 at

10.  Thus, even if Plaintiff had sued Bearden and Pride in their individual capacities, his claims against them would still be due for dismissal.

### C.    Retaliation

Plaintiff alleges Terry, specifically, and all defendants, generally, retaliated against him by making threats and using excessive force — because Plaintiff was filing grievances.    Specifically, Plaintiff alleges as follows in his amended complaint:

On February 23, 2018, Plaintiff was moved from suicide watch to a holding cell in Y-dorm, where he was subjected to acts of threats and retaliation from unspecified individuals to keep Plaintiff quiet about Terry's actions.  ECF Doc. 7 at 11.  Plaintiff alleges that a confinement sergeant entered Plaintiff's cell and "tr[ied] to provoke Plaintiff to hit him."  *Id.*  Plaintiff also alleges the confinement sergeant "back[ed] Plaintiff into the holding cell wall" and threatened to write bogus disciplinary reports and tamper with Plaintiff's food.  *Id.*  Plaintiff then reported the alleged threats to the shift officer in charge, who moved Plaintiff to L-dorm.  *Id.*

On February 24, 2018, Plaintiff "wrote multiple grievances about everything Plaintiff was subjected to from 2-21-18 thru [sic] 2-23-18."  *Id.*  On the following day, Defendant Oliver allegedly threatened Plaintiff with bodily harm if Plaintiff did not remain quiet about the cell extraction incident or Plaintiff's prior reporting of misconduct by officers.  *Id.* at 12.  Plaintiff subsequently wrote an emergency

grievance requesting the preservation of all video and audio that might support Plaintiff's allegations of what he experienced from February 13, 2018, through February 25, 2018. *Id.*

As an initial matter, and as the Court already advised Plaintiff in its prior amend order (ECF Doc. 5), threats or abusive comments made by an officer to an inmate, no matter how repugnant or unprofessional, do not rise to the level of a constitutional violation. *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (finding verbal taunts or threats directed at an inmate do not violate the inmate's constitutional rights); *Jackson v. Sullivan*, 2018 WL 6184782, at *2 (M.D. Ala. Sept. 11, 2018) (collecting cases from all circuits holding that mere threats and verbal abuse are not actionable under section 1983).

Regardless, Plaintiff has not presented evidence sufficient to establish the elements of a retaliation claim. "The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (citing *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989)). To prevail on a First Amendment retaliation claim, a plaintiff must establish: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and

(3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

As to the first element of a retaliation claim, filing grievances regarding conditions of confinement clearly constitutes protected speech. *Redd v. Conway*, 160 F. App'x 858, 862 (11th Cir. 2005); *Rodriguez v. McNeal*, No. 308CV391/MCR/AK, 2009 WL 1563462, at *2 (N.D. Fla. May 28, 2009). Plaintiff's retaliation claim fails, however, on the second element, as he has not shown the subject incidents would likely deter a person of ordinary firmness from engaging in such speech.

Following the allegedly retaliatory acts, Plaintiff submitted several grievances regarding the alleged misconduct. *See Mitchell v. Thompson*, 564 F. App'x 452, 457 (11th Cir. 2014) (reasoning that the plaintiff "continued to file grievances against [the defendant], even after [the alleged retaliation], which illustrates that a person of ordinary firmness would likely not be deterred from engaging in such speech"); *Moss v. Gradia*, 2010 WL 337603 (N.D. Fla. Jan. 21, 2010) (holding there is no adverse effect from alleged retaliation where the plaintiff filed six (6) grievances against the defendant after the alleged retaliation); *Floyd v. Sigmon*, No. 3:15CV482/MCR/CJK, 2016 WL 3713208, at *3 (N.D. Fla. June 9, 2016), *report and recommendation adopted*, No. 3:15CV482/MCR/CJK, 2016 WL 3704495 (N.D. Fla. July 12, 2016) (holding the defendant's allegedly retaliatory conduct

would not "likely deter a person of ordinary firmness" where the plaintiff filed subsequent informal and formal grievances about the defendant's conduct). Indeed, Plaintiff has filed over 110 grievances since February 2018. ECF Doc. 42 at 15.

Additionally, as to the cell extraction, Plaintiff also fails to meet the causation element of a retaliation claim. Conclusory allegations of retaliation without "some facts" that would indicate that the retaliatory act was, in fact, done in retaliation for exercising protected speech is not sufficient. *See White v. Thompson*, 2007 WL 2324613 (S.D. Ga. 2007). The allegations must be more than "general attacks" upon a defendant's motivations—Plaintiff must produce affirmative evidence of retaliation from which a jury could find that Plaintiff had carried his burden of proving the requisite motive. Plaintiff has provided no such evidence that the subject use-of-force incident occurred in retaliation for Plaintiff's engaging in protected speech. To the contrary, the evidence shows Plaintiff *disobeyed lawful commands* and *continued to resist* during the cell extraction.

Thus, Plaintiff has failed to establish a causal link between the protected speech and the allegedly retaliatory cell extraction. He has not shown the officers had a retaliatory motive separate and apart from their legitimate, penological basis for using force on him. *See Moss*, 2010 WL 337603, at *7 (determining that an inmate plaintiff failed to establish a causal link for the alleged retaliatory termination of his job assignment where plaintiff violated prison regulations that authorized

removal from his job assignment for such behavior); *Osterback v. Kemp*, 300 F. Supp. 2d 1238, 1240 (N.D. Fla.), *on reconsideration*, 300 F. Supp. 2d 1263 (N.D. Fla. 2003) ("[I]n light of the deference properly afforded the decisions of prison authorities on matters of safety and proper administration of facilities, the transfer of Plaintiff . . . was not unconstitutional. This is so because the transfer was 'reasonably related to legitimate penological interests' separate and apart from any purpose to retaliate." (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987))).

## IV.    CONCLUSION

Accordingly, it is respectfully RECOMMENDED that:

1.    Defendants' motion for summary judgment (ECF Doc. 42) be GRANTED as to Plaintiffs' federal law claims.

2.    The Court decline to exercise jurisdiction over Plaintiff's state law claims.[10]

3.    Judgment be entered in favor of Defendants Bearden, Oberschlake, Oliver, Pride, and Terry.

---

[10] Plaintiff also asserts a host of state law claims, such as assault, battery, and bribery. However, because the Court finds Plaintiff has not established a federal claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Barcena v. Dep't of Off-St. Parking of City of Miami*, 492 F. Supp. 2d 1343, 1358 (S.D. Fla. 2007) (declining to exercise supplemental jurisdiction over Plaintiff's state law claims because "Plaintiff's claims based on federal constitutional violations . . . fail as a matter of law").

4.    The clerk be directed to close this case.

Done in Pensacola, Florida, this 10th day of August, 2021.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.